All right, our next case is Khashoggi v. NSO Group. Mr. Quirk. May it please the court. The district court committed reversible error in holding that it lacked specific personal jurisdiction over defendants with respect to the plaintiff's claims that defendants accessed and obtained information from her electronic devices in Virginia. The district court's finding of no jurisdiction turned primarily on the first prong of the constitutional test, whether the defendants availed themselves of the opportunity of conducting activities in the forum state. This court has recognized since the ALS scan decision that a defendant's activity in the forum can be conducted electronically and has recognized since at least KARE First of Maryland that even a single contact may be sufficient to establish jurisdiction when the cause of action arises out of a single contact. That's this case. The federal law claim under the CFAA covers whoever intentionally accesses a computer without authorization and thereby obtains information from any computer. That happened here in Virginia. The defendants purposefully committed these acts by accessing Ms. Khashoggi's electronic devices and obtaining the information from them and routing them through their system back to... So how did they do that and where is that? Give me your best paragraphs that alludes to that in the complaint. So there are a number, but on JA56 in the defendant's client service manual, they represent that Pegasus provides... What I'll need from you is the paragraphs in the complaint that make the allegation of actions by the defendant that establish personal jurisdiction. And so the allegation is that the defendants operate the system that accesses the target's devices and the allegations that the plaintiff... or perhaps Saudi Arabia did that, but where are the allegations that this defendant did it? So this comes from the attachment to the complaint, the service manual that demonstrates the defendants involvement and participation in the accessing process. Let's go back again. Give me the paragraph in the complaint that gets you there. So in paragraph 34, we allege that defendants engaged in conduct in Virginia by using the plaintiff's device. And that's our jurisdiction allegation. And where that allegation comes from is the defendants operation of the system that accesses the device where it is. We plead at paragraphs 15, 110, and 111 that Ms. Khashoggi was present and living in Virginia after her marriage to Jamal Khashoggi. And that during this time, the accessing of her devices occurred there. And so the defendants participation in this process comes from... like there are allegations in the complaint and then allegations in the record evidence. That paragraph 60 of the complaint at JA 20, we quote a defendant statement to the press that NSO can identify and stop misuse and shut down the system. This is part of the reason that while the system is operating... So how does that show that they acted in Virginia? It shows that because that's where the devices were and... Right, but there's no allegation that I can see that it says, even though they might have this capacity, that this is what they did and they did it in Virginia. So the allegations, the support for that conclusion comes from the exhibit to the complaint, which shows how their system operates and it also comes from their representations in there. At JA 77, the defendants represent to their foreign state clients that in the event of an exposure risk, we will automatically shut down the Pegasus system. So that in the event that there's a risk of them getting caught, defendants, not the foreign state, will shut down the system. So the defendants are involved in the system's continued operation until it's shut down. Right, I understand from a 30,000 foot perspective that that's what they can do. I'm still having trouble finding where in the complaint you say they did this and they did it in Virginia. So they did it in Virginia comes from the paragraph's reference that that's where the plaintiff and her devices were. The allegation that they did this is this is the system that was found on her devices. And it's a system that throughout their service manual, they illustrate their control and their involvement in the system's operation. And so you have that she's in Virginia with her device and allegations that the device is monitored consistently such that we can plausibly infer that while she was in Virginia, it was monitored or data was extracted. But the disconnect comes at where are the plausible allegations that the defendants did the extracting in Virginia? Right, there's lots of allegations that the defendants can get a report immediately when data is available or that they have ways to manage their system. But where is the allegation that the defendants do the extraction? That's the reaching into Virginia that seems relevant here. And so, I mean, an illustration of this is at JA69, the figure five, which maps out how the system works. And it shows a sequence of steps, the first of which is the device in Virginia, the next of which are a series of servers that the defendants operate, and then the last of which is the information reaching the clients overseas. And so the defendants... Well, that shows maybe that they could do it. But I think what we're looking for is where in actuality did they do it? And there's, all there is is the representation that their system doesn't operate in the United States. Our expert, Dr. Marsak, rebutted that by showing that this hasn't been demonstrated, this would be highly difficult to accomplish, and that in fact the Pegasus system has been used on devices, on at least one device, if not more, in the United States. So in that sense, the defendants are the ones operating there in order for the data on the device, the information on the device in Virginia, to get from the device through the defendant's server system to the foreign state client on the other end. And so the representations that defendants make in their service manual, since agent installation and data are transferred over public networks, we make sure it is transferred in the most efficient and secured way, all the way back to the customer's servers. That's a JA-79. That's defendants putting themselves in the transmission from the device all the way back to the defendant's, the client's server on the other end. If I could turn briefly to the immunity question that the district court decided favorably to the plaintiff. And so that's the defendant's cross-appeal issue, am I right on that? It's the position that we say, and they said, is an alternative grounds for affirmance. They say it's a cross-appeal issue. So it's up to you. If you want to address that now, you can, but you have rebuttal, and if they raise it in their argument and you wanted to address it in your rebuttal, you could. You can decide how you wish to pursue it. Well, since they raised it in their principal appellate brief, they raised it as a grounds for affirmance of the decision. I'll address it now. There is no common law immunity for foreign independent corporate entities in light of the FSIA. This is what the Ninth Circuit ruled in the WhatsApp decision. The FSIA defines a foreign state to include an agency or instrumentality. It then defines an agency or instrumentality with a three-part definition, two of which the defendants don't satisfy. First, it must be a separate legal person including a corporate entity. The defendants satisfy that. It must also be an organ of or majority owned by the state or its subdivision. Defendants are not owned by or an organ of the states that they were operating for here. Finally, to be a state entity, the defendant must be not a U.S. citizen and not created by a third country. Here, defendants were created by a third country, Israel. Since the defendants don't satisfy Congress's specific criteria to be a state-connected entity, a state agency or instrumentality, they don't have a claim to immunity and the district court decided this question correctly. If I could finally address the cross-appeal issue, why this is an opposition argument, it's not a cross-appeal argument. The defendants won. They obtained dismissal with prejudice. When defendants filed their principal appellate brief, they recognized that, they argued that this court should affirm the dismissal of plaintiff's complaint, either for lack of personal jurisdiction or in the alternative for lack of subject matter jurisdiction. They admitted this is an alternative grounds for affirmance. This court ruled in the Harriman and DPJ cases just this year. Alternative grounds for affirmance do not provide the right to a cross-appeal and to the extent there's no right to a cross-appeal, theirs should be dismissed. There are no further questions. All right. You've got some rebuttal time, so we'll hear from you again. Mr. Parrish. Thank you, Your Honor. As I understand the docket, you would have rebuttal time as to this foreign sovereign immunity question if you wish to take it after the plaintiff's rebuttal. Yes, Your Honor. I've asked to reserve a few minutes of my time if I may. All right. Thank you. So, thank you, Your Honors. May it please the court. I want to start with your questions because you are correct. There's no allegations of conduct here directed at Virginia and Judge Brinkema in her very careful decision was correct about that as well. Now, Your Honor, you asked what are the paragraphs in the complaint and he said to you this morning it's paragraphs 35 and 110 to 111. If you look at those paragraphs, with the exception of a conclusory assertion in paragraph 35, it is all focused on the allegations of where plaintiff was and what plaintiff was doing. But we know from Walden v. Fuhrer in the Supreme Court that establishing purposeful availment is not focused on the plaintiff but the defendant's conduct. And there, there just isn't enough. Now, Your Honors, the way that they've pivoted a little bit on appeal and before you today is to say, well, this is about surveillance and electronic monitoring and, therefore, as long as there was some data retrieved and you should just speculate that that happened, that's enough. But, Your Honors, you notice that he did not say to you what the standard is under this Court's precedence, which is under this Court's precedence it's very clear not only must there be a cause of action, there also must be manifest intent. And so the manifest intent is essential because it cannot just be the unilateral conduct of the plaintiff that causes the connections to Virginia. There must be allegations specific to the manifest intent for our client to have targeted Virginia. And there just is nothing like that here. The manifest intent cases seem to me to mostly be about a defendant running a web page that's available all around the world and we say we have to show that there was an intent to reach into a certain state, not just that the plaintiff looked at your website in the state. But here we have an intentional tort, which seems different. It has its own intent requirement. But why doesn't that make these manifest intent cases a little distinguishable? Well, Your Honor, we do agree with you that they are distinguishable in the sense that we think that this is their attempt to try to say that there's a special standard here for personal jurisdiction that otherwise they just don't meet. So in one sense we completely agree with Your Honor that those cases really don't apply. But to the extent that you want to address their alternative argument, that as long as there's some, as they put it, sort of a first interception and collection of data that happens in Virginia. Now, there's no allegations in the complaint that actually substantiate that, but that's their theory. We would at least say, Your Honor, that if you're going to apply those cases as they ask you to, that you would apply the manifest intent standard. Your Honor, going to perhaps an implied part of your question there, or some part of it, relates to the idea that this is an intentional tort. But I do think Judge Brinkman was absolutely correct in thinking the difference between the cases that they really haven't cited to you anymore, but they did cite below to her, which is all of those cases were direct actions where the allegations were that a specific actor engaged in specific conduct targeted at Virginia. So in the case of the Russian person who was exercising a website. But here, the allegations are just the opposite. The allegations are that Saudi Arabia and the Emirates installed or tried to install the program in the Emirates and in Saudi Arabia, not in Virginia. And there's no evidence that her phones were ever accessed, no allegations that they were ever accessed in Virginia. So all there is is the speculation that actually the installation worked, that then when it came to Virginia that she did it unilaterally, that that on itself then meant that there was continuing monitoring. But there's no allegations. If I'm recalling correctly, there is an allegation in the complaint that the software was implanted in her phone in Dubai? That's what they allege. Right. Yep. Okay. So, Your Honor. There's no allegation that it was implanted in Virginia. That's exactly right, Your Honor. And, Your Honor, I just say this because I don't think we need to get there, but the undisputed record evidence is on JA-95, which is that this program doesn't operate in the United States. Now, he said that that was rebutted by Dr. Marzak at JA-136. But if you take a look at that declaration, you will see that Dr. Marzak says, we weren't able to tell whether Pegasus was even ever installed on her phone. And then he raises sort of three questions that he has about whether it might be possible to operate in the United States. So he says, look, there's some suggestions that the app has been presented to the FBI, and in that context maybe it operated. We don't know for certain because we haven't fully analyzed whether it might have operated, and we don't know whether some data might have gone through, notwithstanding all of the restrictions. None of that is sufficient to carry their burden, particularly given the fact that there's nothing in the complaint that substantiates this. This is just after the fact attempt to add to the complaint. Well, we're at the stage where we're assessing a complaint, so we have to take the supported allegations as true. How can we credit the defendant's assertion that this program never works in the United States when plaintiff says it does, the plaintiff cites the WhatsApp litigation where a 202 phone number was targeted? You know, you would get to prove whether that's true eventually, but how can we credit your assertion over hers at this point? Well, Your Honor, I would say two things, which is that you don't need to get to any of this if you just look at the complaint and recognize that she hasn't pled enough to actually show that there's anything. To the extent that you're willing to consider the additional materials that she wants to rely on outside of the complaint, and you want to treat this as more of an evidentiary showing, all I would say is that the evidence is unrebutted that was presented to the district court. So, Your Honor, I'm not suggesting you need to rely on it, but I am asking for sort of parity and the idea being is that there's nothing in the complaint to the extent they're trying to supplement by looking at evidence and you want to think of it in those terms, then the evidence cuts in our direction, not in hers. So, Your Honors, I'm not sure what else I need to say about this because it really, Judge Brinkman did a very good job of walking through the fact that if you're going to allege there needs to at least be an allegation that somehow we were involved in accessing the phones we weren't, that that actually happened in Virginia. There's no allegations about that. That there was some conduct that we directed towards Virginia. There's no allegations about that. This is an Israeli company with all of its employees and everything located abroad, not in Virginia. There is just nothing to connect this case to Virginia except for her unilateral conduct and then speculation about whether there might have been continuing monitoring, but again, no allegations to support that at all. So, Your Honors, I'll just say a few words about the alternative argument, some subject matter jurisdiction. We think this is a fairly straightforward argument and, of course, you don't need to reach it. If we agree with you and the District Court that there's no personal jurisdiction, we would have no reason to address this. Correct, Your Honor, you just took the words out of my mouth. You do not need to reach this issue. If you had any concerns with the District Court's decision, though, you would have to reach it in order to resolve the appeal because precisely it's a question of subject matter jurisdiction. Again, Your Honor, the more they've argued that we are acting on behalf of Saudi Arabia and the Emirates on a continuing basis, the more they walk into the immunity issue. The way that we look at it, Your Honors, is that the Supreme Court has said that FISA, that's the federal statute, does not eliminate common law immunity, at least for individuals. And then this Court's decision in Butters stands for the proposition that common law immunity applies to agents, not agents that qualify them acting in such a way that they themselves become the sovereign, an organ of the state, but for agents like an individual who's acting on behalf of the state but not as an organ of the state itself. And in those contexts, Butters is very clear that you don't look at the nature of who, but you look at the nature of what, what is the conduct. And the only argument the District Court put aside for saying that we will not apply Butters here is the idea that that was an American company in the Butters case and this is a foreign company. And as you can see from our brief, we just don't think that's consistent with the comedy that applies under immunity doctrine, which is that if anything, the agents who are acting on behalf of the state for its benefit on foreign states are entitled to just as much immunity as anyone would be in the United States itself. And, of course, we recognize that this is inconsistent with what WhatsApp has said, but, of course, this court should follow the Fourth Circuit precedent, not the Ninth Circuit precedent. Do you agree that under our precedent there can be no immunity for acts that violate the moral norms of international law? Your Honor, I think that's a complicated question. I'm not intending to duck it, but I do think that if you were to reach that, it wouldn't be reached on the record that's been briefed before you because I think under Butters it's pretty clear that at least to the extent that you're engaging as an agent that immunity would apply. There might be a separate argument about violating norms, but that hasn't been fully briefed. It hasn't been fully presented. And we would argue it doesn't apply here in the way that the allegations have been set forth in the sense that the allegations against us, obviously there's some terrible conduct that is being alleged, but the specific conduct relating to whether a foreign government might have cybersecurity software used to protect against criminal and terrorist activity, that is not against the international norms. So to the extent that there was more to that, it wouldn't come in at the question of subject matter jurisdiction right now and certainly not on the record or on the allegations that are before you. We might need to know more than to decide whether the defendants were, in fact, acting at the orders of a foreign sovereign, and if so, what their acts involved. Well, Your Honor, I would say that... Before we could rule on an immunity question. Well, Your Honor, again, I would say that the problem here is in the allegations and the complaint, which is that the thinness of the personal jurisdiction allegations, and again, you can just agree on personal jurisdiction grounds, but they reinforce the lack of subject matter jurisdiction because the only allegations here are that we licensed the product to these governments. Everything else that's happened is really focusing on Saudi Arabia and the Emirates, and there's just not enough of a connection that would allow you to go beyond that on this complaint. So, Your Honor, I would say that I think we win the personal jurisdiction argument, but if you got to subject matter jurisdiction, I don't think there's enough in the complaint that would let you take the next step to try to decide whether this happens to violate international norms. Your Honor, obviously there's a lot in this case, but I've said more than enough. Unless you have any questions, I'd like to reserve the balance of my time. All right, and your rebuttal would go to your cross-claim. I assume that's what he's... Exactly, Your Honor, I assume that's what he's talking about. All right, thank you very much. Mr. Quirk, you've got some time to talk to us. So, Judge Agee, you asked several times for complaint allegations. Paragraph 42 at JA-16, once Pegasus was installed on Ms. Khashoggi's phones, it granted access to all future phone calls, communication activity through apps, and text messages in perpetuity. Wherever the initial installation took place, the access continued. The access carried forward. Paragraph 46 at JA-17, a representative of defendant represents that we hear about every phone call that is being hacked over the globe. Once Pegasus was on Ms. Khashoggi's devices, the defendants continued to access the information from it. The access didn't stop with the installation. The access started with the installation. Right, but I think there's a distinction between saying or alleging that this apparatus had the capacity to enable the defendant to listen in on conversations, as opposed to saying the defendant did it. In paragraph 46, defendants say we did. We hear about every phone call that is being hacked over the globe. Well, it says NSO group stays intimately involved in the surveillance process. We hear about it. But that seems more of a generic statement and not connected to the specific facts of this case. Well, so on a motion to dismiss, the general allegation is presumed, there's an inference that it applies to the specific instance in the case. We haven't had merits discovery to get inside their system and get all their records. We do know that our expert believed that there's reason to believe this was installed on her device. And their representation is this is what their device, what their system enables. And so that's why, based on our allegations that Ms. Khashoggi was in Virginia, and defendants' representations that they access everything that Pegasus accesses, they participated in the tortious acts in Virginia. On the point about whether they automatically shut off their system when a phone is in the United States, this is where the client, the service manual we attach to the complaint is really important. We did a term search for a geographic, for a geog, for a limitation. Nothing. Defendants tell the court we don't operate this system in the United States. They don't tell their clients that. We did a term search in that manual for United States specifically. Defendants tell the court we don't operate in the United States. They don't tell their clients that. I think in this instance, not operating in the United States, given what it looks like their clients were looking for, would have been an important fact. And it's not in the set of information they give about their system to their customers. That's why the court should infer the surveillance, the access to the device, and the obtaining and rerouting the communications did occur in Virginia. If I could finish back on the subject matter jurisdiction point. The defendants argued that the Butters case is controlling. The fact that Butters involved a United States company acting in the United States, sued by a United States plaintiff, makes that a very different case from this one. On the remand from Symantar and the Yusup decision, this court recognized that if common law applies, the State Department's position is important. One of the State Department's positions in that case was, foreign immunity can't apply to Symantar because he was now a United States resident. The State Department's position, which this court adopted was, once you've availed yourself of the United States, your protections are now under domestic law, not foreign immunity law. Thank you. All right, thank you very much. Mr. Parrish, do you have anything you want to add? I'll just say two things, Your Honors. I'll be very quick. I noticed that in distinguishing Butters, I just want to say that I agree with what he said. That was a company acting in the United States, sued by a U.S. plaintiff. All those contacts here are obviously different, but what we're talking about here is the subject matter jurisdiction, and it's clear for his last point there that when the State Department has not appeared in a case or has not provided a specific opinion, that the court gets to decide that as a matter of law. That's very clear. So the issue is properly before you. Again, we don't think you need to reach the subject matter jurisdiction question. We think you can affirm on Judge Brinkham's good decision. But if you do, we would ask that you find that there is immunity under this court's precedent in Butters. Unless the court has any more questions, I thank you for your time. All right, thank you very much. Judge Floyd and I will come down and greet counsel, so bear with us. And then we're going to take a short recess. This honorable court will take a brief recess.
judges: G. Steven Agee, Allison J. Rushing, Henry F. Floyd